FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*ex rel.* Karen Atesoglu, and<br>**KAREN ATESOGLU**, individually,<br><br>Plaintiffs,<br><br>v.<br><br>**RAYTHEON TECHNOLOGIES<br>CORPORATION**,<br><br>Defendant. | No. _____<br><br>**FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C.§ 3730(b)(2)**<br><br>**DO NOT PLACE<br>ON PUBLIC DOCKET**<br><br>**JURY TRIAL DEMANDED** |

### *QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff and *qui tam* Relator Karen Atesoglu, by and through her undersigned counsel Sims & Sims, LLP and Brown, LLC, alleges of personal knowledge as to her own observations and actions, and on information and belief as to all else, as follows:

### I.
### PRELIMINARY STATEMENT

1.      Defendant Raytheon Technologies Corporation is a huge industrial corporation and a major United States defense contractor. The company, which was born of a merger in April 2020 between the Raytheon Company and United Technologies Corporation, manufactures and sells weapons, electronics, and other materiel, including Patriot missiles and related materiel and technology, to the U.S. government for use by the U.S. military.

DISTRICT OF MASS.
U.S. DISTRICT COURT

2021 APR 26 PM 12: 24

IN CLERKS OFFICE
FILED

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

2.    Through the Foreign Military Sale or "FMS" program,[1] Defendant also sells Patriot missiles and related materiel and technology to the U.S. government for resale to the governments of at least 17 nations,[2] including Bahrain, Kuwait, Romania, and Taiwan.

3.    Like other vendors that negotiate large contracts with the United States, Defendant is required to disclose its estimated costs, and its bases for arriving at those costs. The government then relies on these disclosures to negotiate a contract price.

4.    On certain Patriot contracts, Defendant did not comply with this disclosure requirement. Instead, Defendant knowingly submitted inflated cost estimates, for both direct and FMS contracts.

5.    By doing so Defendant was able, on certain of these contracts, to (a) obtain higher initial funding that it was entitled to; (b) obtain higher overall contract prices than it was entitled to; and/or (c) realize higher profits than it had negotiated with the United States.

6.    Because these contracts were procured through the use of knowingly false cost estimates, all claims Defendant made for payment under these contracts were false and fraudulent for purposes of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

7.    Relator brings this *qui tam* action on behalf of the United States under the FCA to recover treble the damages sustained by, and civil penalties and restitution owed to, the United States as a result of Defendant's fraud.

8.    Relator also brings a claim on her own behalf pursuant to 31 U.S.C. § 3730(h), the anti-retaliation provision of the FCA, to recover double backpay and other damages she sustained

---

[1] *See* ¶¶ 89-93, *infra*.

[2] *See, e.g.*, https://www.raytheonmissilesanddefense.com/capabilities/products/global-patriot-solutions (last accessed April 14, 2021).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

as a result of Defendant's termination of her employment in retaliation for her lawful attempts to stop the fraud alleged herein.

9.      This Complaint is being filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). A copy of this Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, was served on the Attorney General of the United States and the United States Attorney for the District of Massachusetts, pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d).

## II.
## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because the Complaint raises a federal question; and pursuant to 31 U.S.C. § 3732, because the action is brought under 31 U.S.C. § 3730 and Defendant is domiciled in and transacts business in this District.

11.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant has at least "minimum contacts" with the United States, and can be found in and/or transacts business in this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), because at all times relevant to this Complaint, Defendant regularly conducted substantial business within this District and maintained employees in this District.

13.     The Complaint has been filed within the time period prescribed by 31 U.S.C. § 3731(b).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

### III.
### NO PUBLIC DISCLOSURE;
### INDEPENDENT AND MATERIAL KNOWLEDGE
### OF THE VIOLATIONS ALLEGED HEREIN

14.     Relator makes the allegations in this Complaint based on her own knowledge, experience and observations.

15.     There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), of the allegations or transactions in this Complaint. Relator is the "original source" of the allegations in this Complaint even if any such public disclosure occurred. To the extent that there may have been a public disclosure under 31 U.S.C. § 3730(e)(4)(A), Relator possesses information that is independent of and materially adds to any allegations that may have been publicly disclosed.

16.     Relator voluntarily provided information about Defendant's violations to the United States before filing this action.

### IV.
### THE PARTIES

A.      **Plaintiff the United States**

17.     Relator brings this action on behalf of Plaintiff the United States. At all times relevant to this Complaint, the United States has paid Defendant, under the contracts at issue in this Complaint and others, for materiel, technology, and related services and support, both for the use of the United States military and for the use of militaries of other countries.

B.      **Defendant Raytheon Technologies Corporation**

18.     Defendant Raytheon Technologies Corporation is a major United States defense contractor and industrial corporation with core manufacturing concentrations in weapons, and both military and commercial electronics.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

19.     Raytheon Technologies Corporation is the result of a merger in April 2020 between the Raytheon Company and United Technologies Corporation.

20.     Upon the 2020 merger, Raytheon Technologies Corporation assumed all assets and liabilities of its predecessor, the Raytheon Company.

21.     Raytheon Technologies Corporation and its predecessor the Raytheon Company are both referred to herein as "Raytheon" or "the Company."

22.     At all times relevant herein, Raytheon has been headquartered in Waltham, Massachusetts, which is within this judicial District.

**C.      Relator Karen Atesoglu**

23.     Relator Karen Atesoglu worked at Raytheon's facility in Tewkesbury, Massachusetts, as a Manager III of Technical Accounting from November 6, 2017, until March 18, 2020, when she was terminated in violation of 31 U.S.C. § 3730(h).

24.     Relator holds a Master's degree in Business Administration and is certified as a Public Accountant by the New Jersey State Board of Accountancy.

**V.
DEFENDANT'S FRAUD**

**A.      Factual Background**

25.     At all times relevant herein, Raytheon Company was composed of four business segments: Integrated Defense Systems ("IDS"); Raytheon Missile Systems; Intelligence, Information and Services; and Space and Airborne Systems.

26.     Relator was part of a group that supported the IDS business segment, which had three primary product lines: (a) Integrated Air and Missile Defense ("IAMD"); (b) Seapower; and (c) Mission Systems and Sensors and Advanced Technology. Relator directly supported IAMD.

5

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

27.    Relator reported to Andrew Burnham, a Senior Financial Manager for IDS. Burnham reported to Walter Luikey, a Business Controller for IDS.

28.    Relator's duties included reviewing all new IAMD customer contracts for revenue recognition assessment and accounting implications, and ensuring proper approvals were obtained per Raytheon's policies and certain "key controls" under the Sarbanes-Oxley Act of 2002 ("SOX").

29.    Relator also reviewed IAMD Estimate at Completion ("EAC") packages[3] deemed to be material, on a quarterly basis; responded to questions regarding EAC policies and procedures; reviewed ad-hoc business transactions for accounting implications; reviewed all material new business proposals Raytheon made to its customers, including the United States; and supported annual and quarterly audits by PricewaterhouseCoopers ("PwC"), Raytheon's outside auditor.

30.    Based on the revenue and operating income for the three IDS product lines, Relator supported approximately half of the entire IDS portfolio and was assigned approximately seventy percent of the IDS EAC packages.

31.    It was contrary to Raytheon policy for an employee at Relator's level to have this amount and type of responsibility. For instance, per policy, many of the EAC packages that Relator was required to review and approved should have been Luikey's responsibility instead.

32.    Despite her significant responsibilities, Relator was excluded from many meetings in which policies that bore directly on her work were discussed and established.

---

[3] The *Guide to the Project Management Body of Knowledge*, sixth edition (Project Management Institute, 2017) defines an Estimate at Completion as "the expected total cost of completing all work expressed as the sum of the actual cost to date and the estimate to complete." EAC is a widely used forecasting tool. Raytheon's controls require that an EAC package be prepared for every large contract, every quarter, until the contract is closed out. However, the EACs are for internal use and are *not* shared with the United States.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

33.     This pattern of exclusion and unfair treatment continued throughout Relator's tenure at Raytheon, and worsened once she began questioning the Company's fraudulent practices and trying to put a stop to them.

**B.      Defendant's fraudulent conduct**

34.     At least by January 2019, Relator came to believe that Raytheon was fraudulently procuring some of its contracts with the United States, including both direct and FMS contracts, as exemplified by the particular contracts discussed below.

*Knowingly false cost estimates: the Romania 3-Lot UCA contract*

35.     In May 2019, Raytheon was awarded an Undefinitized Contract Action ("UCA")[4] by the United States. The UCA was for Patriot radars, associated fire units, and system integration and program management services to be sold to the United States for resale to the government of Romania through the FMS program (the "Romania 3-Lot contract").[5]

36.     During the negotiations that led to this award – and, for that matter, during all contract negotiations discussed herein – Raytheon was required under the Truth in Negotiations Act, 10 U.S.C. § 2306a ("TINA"), to provide truthful cost estimates to the United States.[6] The estimates that were submitted were reviewed and approved by senior management prior to submission.

---

[4] "UCAs, sometimes called 'letter contracts' (*see* FAR 16.603-1), are used to create contracts with the government when one or more elements of a contract cannot be agreed upon, and there is an urgent need to begin production. These elements can include terms, conditions, or even price; however, the UCA must include a schedule that sets forth when any open terms of the UCA are to be definitized. FAR 16.603-2; DFARS 217.7401, 217.7404-3. ... [T]he DFARS permits the use of UCAs '*only* when (1) the negotiation of a definitive contract action *is not possible* in sufficient time to meet the Government's requirements; and (2) the Government's interest *demands* that the contractor be given a binding commitment so that contract performance can begin *immediately*.' DFARS 217.7403 (emphasis added)." https://govcon.mofo.com/acquisition-regulations/the-basics-of-undefinitized-contractual-actions-ucas/ (last accessed March 20, 2021). It is in the interest of a vendor like Raytheon to finalize a UCA as soon as possible after the initial award, before the cost estimates can be tested by real-world experience, while it is in the interest of the United States to delay definitization as much as possible so that they can see more of the vendor's actual costs.

[5] The Romania 3-Lot contract was awarded as a modification under contract number W31P4Q-15-C-0022.

[6] *See* ¶¶ 94-98, *infra*.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

37.     After Raytheon was awarded the Romania 3-Lot contract, Burnham instructed Relator to record the contract showing its true costs, which were lower than the estimates that had been provided to the United States in negotiations – demonstrating that the estimates provided in negotiations were knowingly false.

38.     Relator originally refused to approve the amount requested by Burnham for the Romania 3-Lot contract, but the contract was eventually recorded at approximately 97% of the estimated cost that had been submitted to the United States during negotiations.[7]

39.     The contract was then initially funded by the United States based on the falsely inflated cost estimate that Raytheon had *originally* submitted[8]; thus, the Company was able to claim millions of dollars more in initial U.S. funding than it was actually entitled to.

40.     Because the Romania 3-Lot contract was procured on the basis of knowingly untruthful cost estimates, all claims Raytheon made for payment on that contract were false and fraudulent for purposes of the FCA.

***Knowingly false cost estimates: the Bahrain UCA contract[9]***

41.     In January 2020 Raytheon was awarded a UCA for Patriot radar and associated equipment to be resold by the United States to the government of Bahrain.

---

[7] According to the Program Finance team, this was in part to "align" the Romania 3-Lot contract with the Romania 1-Lot contract The Romania 1-Lot contract, initially awarded in May 2018, had been booked by Raytheon at approximately 80% of the total cost that Raytheon had provided to the United States. Relator believes that, due to the timing of the finalization of the Romania 1-Lot contract (circa summer of 2019), Raytheon was not able to overstate the Romania 3-Lot contract as much as it did the Romania 1-Lot.

[8] A UCA is awarded by the United States with a Not to Exceed ("NTE") value equal to 119.5% of the target cost submitted by Raytheon. The contract is then initially funded at 49% of the NTE value. Therefore, by inflating its cost estimate, Raytheon obtained an inappropriately high NTE value, which resulted in inappropriately high initial funding from the government.

[9] This UCA was also awarded as a modification under contract number W31P4Q-15-C-0022.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

42.     During the negotiations that led to this award, Raytheon was required to provide truthful cost estimates to the United States. The estimates that were submitted were reviewed and approved by senior management prior to submission.

43.     After the contract was awarded, the IDS Program Finance team asked to record only approximately 90% of the cost that had been negotiated with the United States, and attempted to justify this request by stating that IDS *had a history* of bidding conservatively and finding efficiencies after contract award.

44.     This information was not provided to the United States during negotiations.

45.     Relator told Burnham that she would not approve the contract value because it was not consistent with the cost estimate that Raytheon had provided to the United States. Relator told Burnham she believed the only reasonable amount was the cost that had been approved by senior management and provided to the United States during negotiations, and that for her to approve any other amount would be inappropriate.

46.     Burnham invited Relator to a meeting with IDS Program Finance to discuss the contract value of the Bahrain UCA contract. Relator refused to attend, noting that she had escalated her concerns to Raytheon's Corporate Ethics.

47.     Burnham himself eventually approved the contract value. This allowed Raytheon to claim millions more in initial U.S. funding than the Company was actually entitled to. It also allowed the possibility that the contract would be definitized at an inaccurately high value (enabling Raytheon to obtain a higher overall contract price than it was entitled to), and the possibility that Raytheon would make a higher profit on the contract than the United States had negotiated.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

48.     Because the Bahrain UCA contract was procured on the basis of untruthful cost estimates, all claims Raytheon made for payment under that contract were false and fraudulent for purposes of the FCA.

*Knowingly false cost estimates: other contracts*

49.     Relator is aware of at least two other UCAs that Raytheon procured using knowingly false cost estimates[10]:

> a.  In September 2018, Raytheon was awarded a UCA to provide Patriot radars, associated fire units, and system integration and program management for resale to the government of Poland. The Company eventually recorded the contract at approximately 90% of the estimated cost that it had submitted to the United States.

> b.  Similarly, in March 2019 Raytheon was awarded a UCA to provide military equipment for resale to the government of Kuwait. The Company eventually recorded the contract at approximately 83% of the estimated cost that it had submitted to the United States.

50.     Because both of these UCA contracts were procured on the basis of knowingly untruthful cost estimates, all claims Raytheon made for payment thereunder were false and fraudulent for purposes of the FCA.

*Excess materials and efficiencies found after contract awards*

51.     Raytheon consistently padded its material requirements and labor costs in contracts it negotiated with the United States, both for the FMS program and for U.S. military use; then once the contracts were awarded, the Company "found" excess materials and labor efficiencies which reduced its costs.

52.     Once found, these excess materials and labor efficiencies were not reported to the United States; nor were the contracts renegotiated to reflect Raytheon's actual costs.

---

[10] Both of these UCAs were awarded as modifications under contract number W31P4Q-15-C-0022.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

53.     In fact, Raytheon has a practice of moving excess materials from one contract to another, as needed, in order to manipulate costs and earnings.

***Excess materials: the Patriot Performance Based Logistics contracts***

54.     Raytheon has several firm fixed price contracts with the United States for Patriot Performance Based Logistics for the benefit of the U.S. military (the "PBL Contracts").

55.     Each of these contracts is denominated by the year in which its Period of Performance ("PoP") begins – e.g., PBL 2013, PBL 2019, etc.

56.     For several quarters after the end of the PoP for the 2013 PBL Contract,[11] the EAC packages that Raytheon prepared did not identify excess materials.

57.     The Q1 2020 EAC for the PBL 2013 contract identified, for the first time, $345,000 in excess materials that had been moved to another contract, and an additional $128,000 in excess materials that most likely was later moved to other contracts.

58.     Essentially, Raytheon had included approximately $473,000 of unnecessary materials in that contract, causing the United States to pay for the materials even though Raytheon was not using them for the United States' benefit.

59.     Similarly, excess materials totaling $5.882 million were identified on the PBL 2019 contract[12] for the first time in Q4 2019.

60.     The excess materials in these two contracts were only there to be "discovered" because Raytheon had knowingly padded its materials requirements when negotiating with the United States, in order to obtain payment to which the Company was not entitled.

---

[11] Contract number W31P4Q-13D-0001-0001; PoP December 1, 2013 to December 31, 2015.
[12] Contract number SPRBL1-19-F-0055; PoP January 1, 2019 to December 31, 2019.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

61.     These contracts were thus procured on the basis of knowingly untruthful estimates of materials costs.

62.     Because these contracts were procured on the basis of knowingly untruthful estimates, all claims Raytheon made for payment thereunder were false and fraudulent for purposes of the FCA.

### *Excess materials: the Kuwait 2-Lot contract*

63.     The Kuwait 2-Lot contract, an FMS firm fixed price contract, provided Patriot radar and associated equipment to the United States for resale to the Kuwait Government.[13] The contract was initially awarded as a UCA, and was definitized in October 2017.

64.     In the Q4 2017 EAC for the Kuwait 2-Lot contract, which was prepared shortly after definitization of the UCA, Raytheon identified excess materials totaling $1.959 million.[14]

65.     In the Q1 2020 EAC for the same contract, Raytheon identified an additional $4.085 million in excess materials, *in addition to* the more than $1.1 million in materials that had been moved to other contracts in the interim.

66.     The excess materials were only there to be "discovered" because Raytheon had knowingly padded its materials requirements when negotiating with the United States.

67.     The contract was thus procured on the basis of knowingly untruthful estimates of materials costs.

68.     Because the Kuwait 2-Lot contract was procured on the basis of knowingly untruthful estimates, all claims Raytheon made for payment thereunder were false and fraudulent for purposes of the FCA.

---

[13] Contract number W31P4Q-14-C-0052.

[14] In this same EAC, Raytheon also "discovered" that it no longer required approximately $1.1 million that had been budgeted for failures of the radar/fire units. Burnham often joked that the IAMD group "sandbagged" their bids as if they were building the Patriot radar for the first time.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

### Labor "efficiencies": the Taiwan and Patriot Engineering Services contracts

69.     Raytheon also found certain "efficiencies" after the award of firm fixed price contracts, resulting in lower costs than had been submitted to the United States during negotiations.

70.     For example, in December 2019, Raytheon negotiated an FMS contract with the United States for technical services to be provided to the government of Taiwan.

71.     This contract was a follow-on to a previous contract,[15] in which Raytheon had negotiated personnel costs related to having a certain number of Raytheon employees in Taiwan to work on the contract.

72.     After that previous contract had been awarded, Raytheon determined that it could accomplish the work with fewer employees in-country. As a result, the United States paid approximately $139,000 in personnel costs  for which it received no benefit whatsoever. Raytheon did not inform the United States of these excess costs.

73.     Then, when the follow-on contract was negotiated, Raytheon once again used personnel cost estimates for the original, *larger* number of employees, even though the Company knew by then from actual experience that the work could be done by fewer employees.

74.     Moreover, Raytheon included estimates for relocation costs when negotiating both the original *and* the follow-on contract, even though most, if not all, of the employees who were already in Taiwan on the original contract would be staying on to continue working on the follow-on contract.

75.     Thus, the United States paid approximately $578,000 on the original contract to relocate personnel *out of* Taiwan, even though Raytheon never incurred those costs.

---

[15] Contract number SPRBL1-15-D-0017-0030.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

76.     Raytheon also included more than $376,000 in the follow-on contract to relocate personnel *into* Taiwan, when the Company knew such relocations would not be necessary because of the personnel who had stayed on from the original contract, and so those costs would not be incurred.

77.     Similarly, after securing a multi-year, multi-million dollar firm fixed price contract with the United States in 2019 for Patriot engineering services, Raytheon identified efficiencies due to "labor mix." In essence, Raytheon either paid employees less than what it had included in the bid, or it used less-skilled (and thus lower-paid) employees than it had bid for. Either way, the United States paid costs that Raytheon did not incur and knew it would not incur.

78.     In the negotiations described above, the United States was entitled to rely on, and did rely on, Raytheon's cost estimates as truthful.

79.     Because these contracts were procured by Raytheon using knowingly false cost estimates, all claims for payment submitted by Raytheon under these contracts were false and fraudulent for purposes of the FCA.

## VI.
## RETALIATION AGAINST RELATOR

80.     Having grown alarmed at the fraud described herein, as well as numerous accounting irregularities she had observed, Relator refused to rubber-stamp several Q1 2020 EAC packages. If the packages were not ultimately approved, Raytheon could have potentially faced an unfavorable financial impact of many millions of dollars.

81.     Early on the morning of February 26, 2020, Burnham sent five insistent emails to Relator in quick succession, while she was still at home, asking whether she was recommending

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

approval of particular EAC packages.[16] Coming on top of several other incidents, the thinly veiled bullying of these emails caused Relator to experience anxiety and chest pain.

82.    Relator responded while still at home, noting Burnham's insistence, describing his explanations regarding "excess materials" in those EACs as invalid, and stating that she felt she was being bullied. Relator copied the VP of Corporate Ethics, who wrote back to say that someone would contact Relator to discuss her concerns.

83.    When Relator later went into work she went straight to the employee clinic, where she was diagnosed with high blood pressure.

84.    Relator then went to the ER at the Saints Campus of Lowell General Hospital.

85.    Relator was released that same evening with no further follow-up required.

86.    The following day – February 27, 2020 – a Raytheon HR Manager contacted Relator to indicate Raytheon was looking into her concerns and would get back to her sometime in the following week.

87.    Relator never received any further communication from HR or Corporate Ethics until she was terminated on March 18, 2020.

88.    Raytheon terminated Relator in retaliation for her lawful efforts to put an end to the fraudulent conduct described herein. Put simply, Relator had made herself a thorn in Raytheon's side, which the Company decided to pull.

---

[16] As noted above, Raytheon Company merged with United Technologies in the second quarter of 2020 to form Raytheon Technologies. The impending merger created even more pressure in February 2020 – the time of Burnham's emails – to show favorable financial impacts from EAC packages that were submitted for review. And two weeks before Burnham's emails, IDS CFO Farnsworth had emailed the Program Finance team, reminding them that various bonus payouts would be affected by Q1 2020 performance. This led to Relator being bombarded with EAC packages that purported to show substantial favorable financial impact in that quarter.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## VII.
## THE LEGAL FRAMEWORK

**A.     The Foreign Military Sales ("FMS") Program**

89.     The FMS program is governed by the Arms Export Control Act, 22 U.S.C. §§ 2751 *et seq.* (the "AECA"), which authorizes the President to enter into "international arrangements with friendly countries" for the sale of United States military equipment and related services. *Id.* The program, which is jointly managed by the Department of State and the Department of Defense ("DoD"), was designed by Congress to address the need for international defense cooperation, and is an important part of United States' foreign policy. *Id.*

90.     In furtherance of the FMS program, the AECA authorizes the President (a) to sell defense materiel and services from existing DoD stock to foreign nations, and (b) to procure items for the United States for resale to foreign nations. 22 U.S.C. §§ 2761(a)(1), 2762(a).

91.     In new-procurement FMS sales, including the sales at issue here, "the United States Government contracts with a foreign government, and then the United States Government contracts separately with the contractor. The contractor sells the items to the United States Government, which then resells to the foreign government." *U.S. ex rel. Campbell v. Lockheed Martin et al.,* 282 F. Supp. 2d 1324, 1327 (M.D. Fla. 2003). "In this arrangement there is no privity of contract between [the contractor] and the foreign countries. ... [T]he United States actually takes title to the [materiel] upon delivery from [the contractor], and title then passes from the United States to the foreign government. The United States is benefitting its own foreign policy interests when it undertakes the sale of military equipment under the FMS program ...." *Id.* at 1341.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

92.     Funds paid to the United States by foreign governments for FMS sales are deposited into what is commonly referred to as the "FMS Trust Fund." Once deposited, the funds become property of the United States.

93.     Contractors, such as Raytheon here, are paid by the United States from these funds. Thus, a claim on these funds is a claim upon the United States, for purposes of the False Claims Act.

## B. The Truth in Negotiations Act and the Federal Acquisition Regulation

94.     The Truth in Negotiations Act, 10 U.S.C. § 2306a ("TINA"), and the Federal Acquisition Regulation ("FAR"), *see* 48 C.F.R. at § 15.801, apply to all contracts, subcontracts, and contract modifications negotiated with the United States that exceed a certain dollar amount.[17] Both TINA and the FAR govern the contracts at issue here.

95.     TINA and the FAR require a prospective contractor to provide during negotiations with the United States all relevant cost and pricing data, and to certify at the end of such negotiations that the cost and pricing data it submitted were "accurate, complete, and current" as of the date of certification. 10 U.S.C. § 2306a.

96.     The intent of Congress in enacting TINA was to ensure that government contracting officers are provided with accurate and complete information relating to the prices being negotiated. S. Rep. No. 1884, 87th Cong., 2d Sess., reprinted in 1962 U.S. Code Cong. & Admin. News 2476, 2478. Congress intended to curb abuses of the procurement process and to avoid excessive contract costs which "result from a contractor having in [its] possession accurate, complete and current information when the Government does not possess the same data." *M-R-S*

---

[17] The thresholds are: $2 million for contracts or modifications entered into after June 30, 2018 ($750,000 if before); and $750,000 "in the case of a change or modification made after July 1, 2018, to a prime contract that was entered into on or before June 30, 2018." 10 U.S.C. § 2306a(a)(1)(A).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

*Mfg. Co. v. U.S.*, 492 F.2d 835, 842 (Ct. Cl. 1974). The goal of TINA is to place the government negotiator and the contractor on an equal footing at the bargaining table, and "[t]he only way to further the purpose of the statute is to require complete disclosure of costs known to the contractor." *Id.*[18]

97.     In addition, all contracts governed by the FAR must include a clause requiring contractors to "comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to [their] performance" under the contract. *See* 48 C.F.R. § 52.212-4(q).

98.     TINA is such an applicable law.

**C.      The False Claims Act**

99.     The FCA, 31 U.S.C. §§ 3729 *et seq.*, establishes liability for any "person" (natural or corporate) who, *inter alia*:

    a.     "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A);

    b.     "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(l)(B); or

    c.     "knowingly makes, uses, or causes to be made or used, a false record or statement material to …, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money … to[,] the Government," *id.* § 3729(a)(l)(G).

100.    "Knowing" is defined by the FCA to include "deliberate ignorance of the truth" or "reckless disregard of the truth." *Id.* § 3729(b)(1).

---

[18] This is particularly important where, as here, the fairness of a contractor's pricing is not tested by a competitive bidding process. *Cf. U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1329 n.8 (4th Cir. 1989) (making the same point with regard to sole-source contracts).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

101.  The FCA defines "claim" to include "any request or demand [for money], whether under a contract or otherwise … that [ ] is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2)(A)(i).

102.  For each false claim or other FCA violation, the statute provides for the assessment of treble damages, plus a civil penalty. *Id.* § 3729(a)(1)(G).[19]

103.  FCA liability lies where a government contract is obtained through false statements or fraudulent conduct.

104.  Once fraudulent inducement is shown, the original fraud renders all subsequent claims for payment false and actionable under the FCA.

105.  The FCA also contains a *qui tam* mechanism and provides for payment of a percentage of the United States' recovery to the *qui tam* relator. *See id.* at § 3730(b), (d).

106.  The FCA also provides relief for an individual who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" in her employment in retaliation for her lawful acts to stop violations of the FCA. *See id.* at § 3730(h)(1).

107.  Defendant's conduct, as described herein, constitutes

  a.  a scheme to violate 31 U.S.C. §§ 3729(a)(l)(A), (B), and/or (G) and

  b.  a *prima facie* violation of 31 U.S.C. § 3730(h)(1).

---

[19] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 104-410, 104 Stat. 890 (1990), *amended by* the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, 129 Stat. 599 (2015); *see* 28 U.S.C. § 2461 note. On June 19, 2020, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. For such penalties assessed after June 19, 2020, the minimum penalty is $11,665 and the maximum is $23,331. *See* 28 C.F.R. § 85.5; 85 F.R. 37005 (June 19, 2020).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## VIII.
### FIRST CAUSE OF ACTION:
### PRESENTATION OF FALSE CLAIMS
### <u>31 U.S.C. § 3729(a)(1)(A)</u>

108.     Relator repeats and re-alleges paragraphs 34-79 inclusive, as if fully set forth herein.

109.     As detailed *supra*, Defendant Raytheon procured contracts from the United States, based on cost data and estimates that Raytheon knew were false when they were submitted to the United States during negotiations.

110.     Raytheon had a statutory obligation under TINA to provide to the United States, during those negotiations, cost data that were "accurate, complete, and current," and to certify same when negotiations were concluded. 10 U.S.C. § 2306a(a)(2).

111.     Under the FAR, Raytheon also had an obligation to "comply with all applicable Federal, State and local laws, executive orders, rules and regulations" under the contract. *See* 48 C.F.R. § 52.212-4(q).

112.     Raytheon knowingly failed to comply with TINA, and therefore also knowingly failed to comply with its obligations under the FAR. These knowing failures were material to the United States' decision to award the contracts at issue herein.

113.     During the statutory period applicable here, Raytheon presented or caused to be presented to the United States claims for payment on the contracts at issue.

114.     Because the contracts under which those claims were submitted were procured by Raytheon using knowingly false cost estimates, each claim presented for payment was rendered false and fraudulent for purposes of 31 U.S.C. § 3729(a)(1)(A).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

115.    The presentation by Defendant of these false and fraudulent claims caused the United States to pay out sums that it would not have paid if the United States had been aware of the falsity of Defendant's claims.

116.    Each false and fraudulent claim presented or caused to be presented to the United States is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

117.    By reason of the false and fraudulent claims that Raytheon knowingly presented or caused to be presented, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages, plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

**IX.**
**SECOND CAUSE OF ACTION:**
**MAKING OR USING FALSE RECORD OR STATEMENT**
**MATERIAL TO A FALSE OR FRAUDULENT CLAIM**
**31 U.S.C. § 3729(a)(1)(B)**

118.    Relator repeats and re-alleges paragraphs 34-79 inclusive, as if fully set forth herein.

119.    As set forth *supra*, Raytheon made and used false records and statements – to wit, the cost data and estimates it presented to the United States, and the certifications it made that the data supporting those estimates were "accurate, complete, and current" – to procure contracts from the United States.

120.    These records and statements were material to Raytheon's procurement of those contracts, and thus material to Raytheon's false and fraudulent claims under those contracts.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

121.   Raytheon knowingly made and used these false records and statements material to false or fraudulent claims for payment by the government, in violation of 31 U.S.C. § 3729(a)(l)(B).

122.   The making and use by Raytheon of these false records and statements caused the United States to pay out sums that it would not have paid if the United States had been aware of the falsity of Defendant's records or statements.

123.   Each making or use of a false record or statement is a separate violation of the FCA.

124.   By reason of the false or fraudulent records or statements that Raytheon knowingly made and used, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

## X.
## THIRD CAUSE OF ACTION:
## KNOWINGLY AND IMPROPERLY AVOIDING OBLIGATION
## 31 U.S.C. § 3729(a)(1)(G)

### (in the alternative)

125.   Relator repeats and re-alleges paragraphs 34-79 inclusive, as if fully set forth herein.

126.   Raytheon knew during negotiations with United States for the contracts at issue herein that the cost data and estimates it was submitting were not "accurate, complete, and current," as required under 10 U.S.C. § 2306a(a)(2).

127.   In the alternative, Raytheon knew when post-award EACs were prepared that the cost data and estimates it had submitted to obtain those awards had not been (or were no longer) "accurate, complete, and current," as required under 10 U.S.C. § 2306a(a)(2).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

128.    Once it became so aware, Raytheon had an obligation to provide revised cost data to the United States; to adjust payments under these contracts going forward; and/or to return or credit excess amounts already paid by the United States.

129.    Raytheon has not met those obligations. It has therefore knowingly and improperly avoided its obligation to pay or transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(l)(G).

130.    Raytheon has, moreover, knowingly made, used, or caused to be made or used, false records and statements material to those obligations, also in violation of 31 U.S.C. § 3729(a)(l)(G).

131.    Each avoidance by Raytheon of its obligations, and each making or use of a false record or statement material to those obligations, is a separate violation of the FCA.

132.    By reason of Raytheon's knowing and improper avoidance of its obligations, and by reason of its making and use of false or fraudulent records and statements material to its obligations, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

### XI.
### FOURTH CAUSE OF ACTION:
### RETALIATION
### 31 U.S.C. § 3730(h)

133.    Relator repeats and re-alleges paragraphs 80-88 inclusive, as if fully set forth herein.

134.    As set forth *supra*, Relator, in an effort to expose and put an end to Raytheon's fraud, alerted management that she believed the Company was defrauding the United States.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

135.     Defendant Raytheon, through its management, therefore had actual and/or constructive knowledge of Relator's efforts to stop its violations of the FCA.

136.     Defendant Raytheon retaliated by firing Relator for her lawful efforts to stop its violations of the FCA.

137.     Therefore, Raytheon violated 31 U.S.C. § 3730(h)(1), the anti-retaliation provision of the FCA.

138.     Defendant's retaliation has damaged Relator in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

139.     Relator therefore respectfully requests an order awarding Relator the maximum amount of damages available under 31 U.S.C. § 3730(h)(2) including reinstatement, two times backpay, interest, and special damages, all to be determined at trial.

## XII.
## PRAYER FOR RELIEF

**WHEREFORE,** Relator respectfully requests the following relief:

A.     That this Court enjoin Defendant from violating the FCA, 31 U.S.C. §§ 3729 *et seq.*;

B.     That this Court enter judgment against Defendant and in favor of the United States, in an amount equal to the damages the United States has sustained due to Defendant's actions, trebled, plus a civil penalty for each violation of 31 U.S.C. § 3729(a)(l)(A), (B) and (G), pursuant to 31 U.S.C. § 3729(a), as adjusted by operation of the federal Civil Penalties Inflation Adjustment Act of 1990;

C.     That Relator be awarded the maximum amount allowed under 31 U.S.C. § 3730(d);

D.     That Relator be awarded the maximum amount of damages available under 31 U.S.C. § 3730(h)(2); and

E.     That Relator be awarded her costs of this action, including attorneys' fees and expenses; and such other and further relief as this Court deems equitable and just.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## XII.
## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by this Complaint.

Dated: April 21, 2021                    Respectfully submitted,

**SIMS & SIMS, LLP**
**Local Counsel**

*/s/ John L. Fink*
John L. Fink (B.B.O. #683290)
53 Arlington Street
Brockton, MA 02303
508-588-6900 (office)
508-586-3320 (fax)
*JohnFink@simsandsimsllp.com*

**BROWN, LLC**
**Lead Counsel**

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode
Jason T. Brown
    (*pro hac vice* applications forthcoming)
111 Town Place Square, Suite 400
Jersey City, NJ 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
*patalmonrode@jtblawgroup.com*
*jtb@jtblawgroup.com*

*Attorneys for Relator*
*Karen Atesoglu*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2021, I caused a true copy of the Complaint in the matter captioned *United States of America ex rel. Atesoglu v. Raytheon Technologies Corporation*, to be served upon the following via USPS Registered Mail, Return Receipt Requested:

> Office of the Attorney General of the United States
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001
>
> *and by email to*
> *civilfrauds.quitams@usdoj.gov*
>
> AUSA Brian LaMacchia
> Office of the U.S. Attorney
> District of Massachusetts
> John Joseph Moakley
>     United States Federal Courthouse
> 1 Courthouse Way, Suite 9200
> Boston, MA 02210
>
> *and by email to*
> *Brian.LaMacchia @usdoj.gov*

                                        */s/ Patrick S. Almonrode*
                                        Patrick S. Almonrode